[No. B185819. Second Dist., Div. Four. Aug. 24, 2006.]

TWILA PRINCE et al., Plaintiffs and Appellants, v.
UNITED NATIONAL INSURANCE COMPANY et al., Defendants and
Respondents.

234

## COUNSEL

Matison & Margolese, Vana Margolese, Wayne Hunkins; Law Offices of Gregg Goldfarb and Gregg Goldfarb for Plaintiffs and Appellants.

Nielsen, Haley & Abbott, James C. Nielsen and Hillary C. Agnost for Defendant and Respondent United National Insurance Company.

Horvitz & Levy, Lisa Perrochet, Mitchell C. Tilner; Tharpe & Howell, Christopher S. Maile and Soojin Kang for Defendant and Respondent Fire Insurance Exchange.

## OPINION

**MANELLA, J.**—Appellants Twila Prince and David Smith, Jr., appeal from the judgment entered after demurrer was sustained to their complaint against respondent United National Insurance Company (United National). The issue raised in this case is whether an insurance policy's exclusion for injuries arising out of the use of an automobile precludes coverage for the deaths of two young children who were negligently left in a vehicle on a hot day by their foster mother. The trial court concluded that the exclusion applied, and sustained a demurrer in favor of respondent United National. We agree that the use of the automobile was a predominating cause of—and substantial factor in—the injuries to the children, and that the foster mother's negligence was not independent from the use of the vehicle. We, therefore, affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

Appellants' complaint against United National was filed in February 2005. Also named as defendants were Fire Insurance Exchange and Mercury Casualty Co. According to the allegations of the complaint, appellants are the natural parents of Dakota Denzel Prince-Smith and Nehemaiha Nate Prince-Smith, who died while dependents of the Los Angeles County foster care system. Leslie Smoot had been appointed their foster mother. Smoot was licensed by Trinity Children and Family Services (Trinity), to act as a foster parent and was co-owner with her husband of A Child's Place Preschool (Preschool) located in Lancaster, California. In July 2003, Smoot left the two children in her vehicle for more than six hours outside the Preschool, and both died.

Appellants filed suit against the county, Trinity, the Smoots, and the Preschool. American Automobile Insurance Company/Fireman's Fund entered into a settlement agreement with appellants as one of the insurers for the Smoots and the Preschool, and, among other things, assigned them its right to contribution from United National and the other defendant insurers. Trinity, insured by Western World/Tudor Insurance Company, also settled with appellants and similarly assigned any right to contribution owed them.

The complaint alleged in the first and second causes of action that United National issued a "Foster Parent Liability Policy" to Trinity to cover the acts of foster parents licensed or certified under its authority. The Smoots or Trinity allegedly tendered to United National a wrongful death claim brought by appellants, and United National was allegedly "obligated to contribute towards the defense and settlement of the underlying claim," but refused to do so. Instead, American Automobile Insurance Company/Fireman's Fund and Western World/Tudor Insurance Company handled the defense without contribution from respondent. Similar allegations were made with respect to codefendants Fire Insurance Exchange and Mercury Casualty in the third through sixth causes of action.

### The Policy

The parties later incorporated by stipulation the policy issued to Trinity by United National. Part A of the policy provided coverage for "bodily injury and property damage." The following "Exclusion[]" appeared in part A: "This insurance does not apply to: . . . e. 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use[1] or entrustment to others of any aircraft, 'auto'[2] or watercraft owned or operated by or rented or loaned to any insured."

### The Demurrer

United National demurred to the complaint, contending that the above-quoted exclusion in its policy precluded coverage for the injury to the children. The trial court sustained the demurrer. In its order, the court

---

[1] "Use" expressly included—but was not limited to—"operation and 'loading or unloading.' " "Loading or unloading" was defined elsewhere in the policy as "the handling of property: [¶] a. After it is moved from the place where it is accepted for movement into or onto an . . . 'auto'; [¶] b. While it is in or on an . . . 'auto'; or [¶] c. While it is being moved from an—'auto' to the place where it is finally delivered . . . ."

[2] "Auto" was defined generally as "a land motor vehicle or all other motorized land conveyances."

explained that "[t]o find that an injury arose out of the use of a vehicle, the court must find that the use of the vehicle was a 'predominating cause/substantial factor' in causing the injury." (Quoting *American Nat. Property & Casualty Co. v. Julie R.* (1999) 76 Cal.App.4th 134, 140 [90 Cal.Rptr.2d 119] (*Julie R.*).) Referring to the "long line of California decisions that have given 'use of a vehicle' a broad, not restrictive, interpretation," the court found that the "uses" of the vehicle were "parking the car and using the car to hold children," both "readily understood uses of a vehicle."

The court further concluded that "[t]he use of the vehicle was a substantial factor in the children's deaths" and "the instrumentality of their deaths." The court distinguished this court's decision in *Julie R.*, that a rape occurring in a car was not covered by an automobile policy because the automobile was nothing more than the situs of the rape: "In this case, it cannot be seriously argued that the vehicle was merely the 'situs' of Smoot's negligence. Had she abandoned the children in a house, or under a tree, they would not have died in five hours. They died because of the hot car."

The court considered whether Smoot's negligence was independent of the use of the vehicle. "In this case, Smoot's liability simply cannot be dissociated from the use of the vehicle. Absent the hot car, the children would not have died, and Smoot would not have faced any liability for negligence. Because her liability necessarily arose out of her use of the vehicle—parking it and leaving the children in it—it was not independent of the use of the vehicle."

Finally, in response to appellants' contention that "the vehicle use exclusion should not apply at all because the specific intent of the subject policy is to cover the negligent conduct of foster parents toward foster children," the court stated: "This argument . . . would nullify the vehicle exclusion in the subject policy. [Appellants] offer no authority to support such a result, which would be inconsistent with the basic principles of contract interpretation."

Judgment was entered in favor of United National, and appellants noticed a timely appeal.

## DISCUSSION

### I

The sole issue here is whether an insurance policy that excludes from its scope of coverage any bodily injury arising out of the "use" of an "auto" applies to injury to youngsters left in an overheated vehicle after it has come to rest. In the trial court, appellants argued that the exclusion did not apply

because Smoot's negligence was unrelated to her use of the automobile. In their reply brief, appellants raise for the first time the contention that coverage was provided under part B of the policy which applies to "personal injury liability" and that the automobile exclusion found only in part A—applicable to "bodily injury"—does not apply. An argument raised for the first time in a reply brief need not be addressed. (See *Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316 [88 Cal.Rptr.2d 758] ["[A] litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant"]; *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432] ["Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument."].)

Moreover, we note that the term "personal injury" is given a specific definition by the policy that does not include "bodily injury." It is instead limited to injury arising out of the torts of false arrest, malicious prosecution, wrongful eviction, slander and libel, and invasion of privacy. As none of these torts are involved here, the suggestion that part B provided coverage unaffected by the automobile use exclusion in part A does not assist appellants.

## II

The leading authority in the interpretation of automobile use exclusions is *State Farm Mut. Auto. Ins. Co. v. Partridge* (1973) 10 Cal.3d 94 [109 Cal.Rptr. 811, 514 P.2d 123] (*Partridge*). There, a passenger in a car was injured by the discharge of a firearm held by the driver, who was shooting at jackrabbits from an open window. The discharge occurred after the vehicle had driven off the road and hit a bump. The driver had previously modified the trigger of the gun to make it easier to fire. The insurance company that had issued both the automobile and homeowner's policies brought a declaratory relief action seeking a determination which of its policies afforded coverage. The automobile policy stated that it afforded coverage for bodily injuries " 'caused by accident[s] arising out of the . . . use . . . of the owned motor vehicle.' " (*Id.* at p. 98.) The homeowner's policy contained an exclusion for " 'bodily injury . . . arising out of the . . . use of . . . any motor vehicle.' " (*Id.* at p. 99.)

The court initially noted that "[p]ast California cases have established beyond contention that this language of 'arising out of the use,' *when utilized in a coverage or insuring clause of an insurance policy*, has [a] broad and comprehensive application, and affords coverage for injuries bearing almost

any causal relation with the vehicle." (*Partridge, supra,* 10 Cal.3d at p. 100, italics omitted.) Under this rule, there was no dispute that the role played by the car was sufficient to bring the accident within the automobile policy. The issue was whether the homeowner's policy also provided coverage. Pointing to the nearly identical language in the coverage clause and the exclusionary clause, the company argued that "the policies were intended to be mutually exclusive and that no overlapping coverage can be permitted." (*Id.* at p. 101.) The court disagreed, finding that because the driver had been negligent both in his driving of the vehicle and in modifying the trigger of the gun to make it fire more easily, coverage was provided by both policies. The court held that "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries . . . ; *inasmuch as the liability of the insured arises from his non-auto-related conduct, and exists independently of any 'use' of his car, we believe the homeowner's policy covers that liability.*" (*Id.* at p. 103, italics added.)

Later courts have construed the above italicized language to require that "in order for *Partridge* to apply there must be two negligent acts or omissions of the insured, one of which, independently of the excluded cause, renders the insured liable for the resulting injuries." (*Daggs v. Foremost Ins. Co.* (1983) 148 Cal.App.3d 726, 730 [196 Cal.Rptr. 193].) In *Daggs,* the plaintiff was injured while competing in a motocross race when his motorcycle collided with a chain link barrier fence. He argued that *Partridge* applied because the negligence in the design and construction of the fence was independent of his participation in the race. The court disagreed: "The only reasonable interpretation of the allegation[] of plaintiff's underlying complaint is that [the insured] failed to make the motorcycle course safe for the organized racing event in which plaintiff was participating. There is but one negligent act of the insured, not two as in *Partridge,* and this cause of the injuries is not independent of the policy exclusion." (*Ibid.*)

A similar result obtained in *State Farm Fire & Cas. Co. v. Camara* (1976) 63 Cal.App.3d 48 [133 Cal.Rptr. 600]. There, the insured transformed his Volkswagen into a dune buggy, and a passenger was injured while riding in it. Distinguishing *Partridge,* the *Camara* court concluded that the automobile exclusion of the homeowner's policy precluded coverage: "As *Partridge* held, the nonvehicle-related cause must be independent of the vehicle-related cause in order for the liability to be covered by the homeowner's policy. Although the operation or use of the dune buggy was not the sole cause of

the accident, any contributing *design* cause was dependent upon such operation or use, such that any liability for negligent design necessarily arose out of the operation or use of the motor vehicle." (*State Farm Fire & Cas. Co. v. Camara, supra,* 63 Cal.App.3d at pp. 54–55, fn. omitted.)

■ Based on this understanding of *Partridge,* courts have found negligence to be automobile-dependent in a variety of situations that did not involve actual operation of the vehicle. In *Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524 [190 Cal.Rptr. 425], where the conduct alleged was negligent entrustment of a motor vehicle to a minor, the court stated: "The separate and independent act in *Partridge* giving rise to liability was a 'non-auto-related act,' i.e., the filing of the gun trigger. That act had nothing to do with the use or operation of a vehicle. In contrast to *Partridge,* the obligation of the insureds in this case did not arise from an act separate and independent from the use of the vehicle itself." (141 Cal.App.3d at p. 527.)

Other cases have addressed whether a parked vehicle is in use for purposes of coverage or exclusion. These cases make clear that a vehicle need not be moving or even running for injuries to arise out of its use. For example, in *National Indemnity Co. v. Farmers Home Mutual Ins. Co.* (1979) 95 Cal.App.3d 102 [157 Cal.Rptr. 98], the driver of an insured automobile, while taking her nephew home, stopped and parked her car on the opposite side of the street from where he lived. Rushing to get home, the nephew jumped from the car and into the path of another vehicle. The trial court found that the injury arose out of the "use" of the aunt's automobile, and the appellate court agreed: "An automobile can be in 'use' even though at rest. [Citation.] . . . [¶] The presence of small children in an automobile imposes a particular duty of care and alertness upon the driver in selecting the place for and supervising the manner of discharging the children from the vehicle. . . . The process of unloading a child from a motor vehicle does not end the moment that the child's feet touch the ground or when his or her body is entirely outside the vehicle. [¶] . . . [N]othing in [*Partridge*] provides any basis for exonerating the automobile insurance carrier on the present facts." (95 Cal.App.3d at p. 106.) The court went on to say: "There is a complete absence of conduct on the part of the insured which is independent of and unrelated to the 'use' of the vehicle. The conduct of the insured which contributed to the injury simply cannot be dissociated from the use of the vehicle. Nor did the injury, insofar as the insured is concerned, involve an instrumentality other than the vehicle itself." (*Id.* at p. 109.)

The interpretation of "use" to include conduct relating to a vehicle at rest has not been limited to cases finding coverage. In *National American Ins. Co. v. Coburn* (1989) 209 Cal.App.3d 914 [257 Cal.Rptr. 591], the court found the automobile exclusion applied to preclude coverage for injuries sustained when a child entered a parked van in which the emergency brake had not been set and released the transmission, allowing the van to roll over a second child. The court expressly rejected the claim that the child's death had not resulted from the "use" of the car, finding "[i]t cannot be seriously argued that the parking, leaving open and braking of a vehicle are anything other than aspects of the 'use' of the vehicle." (*Id.* at p. 920.) The court further found that any negligence on the part of the van owner in failing adequately to supervise the children "cannot be dissociated from the use of the vehicle itself . . . ." (*Id.* at pp. 920–921.)

Finally, it is clear that a vehicle need not even have been in operation for injuries to have arisen out of its use. In *United Services Automobile Assn. v. United States Fire Ins. Co.* (1973) 36 Cal.App.3d 765 [111 Cal.Rptr. 595], the insured, John Chandler, was at a friend's house, attempting to start the friend's automobile by pouring gasoline into the carburetor. When the gasoline can ignited, Chandler threw it toward the open garage door, where it struck and injured his friend. The issue presented was whether Chandler's automobile policy or homeowner's policy covered the injury. This turned on whether Chandler "was using the [friend's] automobile at the time of the accident and whether such use was an 'actual use.' " (*Id.* at p. 770.) The court answered the questions affirmatively: "Chandler's actions in attempting to start the car constituted a physical relationship to it and was a present use performed for the purpose of making the vehicle operative. The resulting accident was proximately caused by that use. . . ." (*Ibid.*) Moreover, the court found, "while the activity involving the vehicle was peripheral[,] it was not an activity wholly disassociated from, independent of[,] and remote from its use." (*Id.* at p. 771.)[3]

## III

■ No California case has resolved coverage issues under the specific facts presented here. The parties have brought to our attention cases from

---

[3] In a case involving similar circumstances—an insured's negligent repair of his car's brakes—the court in *Gonzalez v. St. Paul Mercury Ins. Co.* (1976) 60 Cal.App.3d 675 [131 Cal.Rptr. 626], came to a contrary conclusion. *Gonzalez* has been repeatedly disapproved. (See, e.g., *State Farm Fire & Cas. Co. v. Camara, supra,* 63 Cal.App.3d at pp. 55–56; *Allstate Ins. Co. v. Jones* (1983) 139 Cal.App.3d 271, 278, fn. 3 [188 Cal.Rptr. 557]; *Gurrola v. Great Southwest Ins. Co.* (1993) 17 Cal.App.4th 65, 69 [21 Cal.Rptr.2d 749].)

other jurisdictions involving children left in overheated vehicles.[4] Although non-California cases may be instructive in some instances, the interpretation of the term "use" as it relates to an automobile coverage provision or exclusion is not an issue that can be decided outside the context of applicable in-state precedent. As the authorities discussed above make clear, California courts take an expansive view of the term and are disinclined to find overlapping coverage. (See, e.g., *Allstate Ins. Co. v. Jones, supra,* 139 Cal.App.3d at p. 278.) Courts outside the jurisdiction do not necessarily follow the same approach.[5]

The California cases most relied on by appellants are *Ohio Casualty Ins. Co. v. Hartford Accident & Indemnity Co.* (1983) 148 Cal.App.3d 641 [196 Cal.Rptr. 164] and this court's decision in *Julie R., supra,* 76 Cal.App.4th at page 134. In *Ohio Casualty,* a high school student, Louise Diepenbrock, was injured while on a school-authorized outing to a lake. She dove from a boat owned and operated by Geoffrey Daly, and was run over by a boat being operated by another parent. Daly was named a defendant and sought coverage under both his yacht policy and his homeowner's policy. The homeowner's policy contained an exclusion for use of a watercraft. The court held the negligent supervision was "a separate and independent cause of the accident, unrelated to the use of the boat" based on the following rationale: "[T]he excluded instrumentality did not play an active role in causing the injury. The

---

[4] Appellants rely on *Mount Vernon Fire Ins. Co. v. Heaven's Little Hands Day Care* (2003) 343 Ill.App.3d 309 [795 N.E.2d 1034, 277 Ill.Dec. 366]. United National cites *St. Paul Mercury Ins. v. Chilton-Shelby* (Ala. 1992) 595 So.2d 1375 and an unpublished federal decision, *Capitol Indemnity Corp. v. Braxton* (6th Cir. 2001), 24 Fed.Appx. 434. The latter two cases found the auto exclusion applicable, while the court in *Mt. Vernon* did not. These cases have no precedential value, but may be considered for whatever persuasive force their reasoning may contain, provided it is not inconsistent with California precedent. We note, however, that the court in *Mt. Vernon* concluded that the vehicle was not in use because it was not "being used as a method of transportation." (343 Ill.App.3d at p. 319.) This is directly contrary to California law. (See *National Indemnity Co. v. Farmers Home Mutual Ins. Co., supra,* 95 Cal.App.3d 102 [157 Cal.Rptr. 98]; *National American Ins. Co. v. Coburn, supra,* 209 Cal.App.3d 914; *United Services Automobile Assn. v. United Fire Ins Co., supra,* 36 Cal.App.3d 765.)

[5] Several cases cited in appellants' brief illustrate this point. In *United States Fidelity & Guaranty Co. v. State Farm Mutual Ins. Co.* (1982) 107 Ill.App.3d 190 [437 N.E.2d 663, 63 Ill.Dec. 14], the court held that an automobile exclusion in a day care center's multi-peril insurance policy did not preclude coverage where a child was injured while exiting a vehicle being driven by a center employee. In *West American Ins. Co. v. Hinze* (7th Cir. 1988) 843 F.2d 263, the court, applying Illinois law, held that an issuer of a homeowner's policy with an automobile exclusion was liable when a car rolled into a lake, drowning the unattended child inside. In *Progressive Ins. Co. v. Zurich Ins.* (2002) 288 A.D.2d 879 [732 N.Y.S.2d 495], the court held that issuers of both homeowner and automobile policies had a duty to defend when the insured's granddaughter was killed crossing the street after getting out of his car. California courts in cases such as *National Indemnity Co. v. Farmers Home Mutual Ins. Co., supra,* 95 Cal.App.3d 102 and *National American Ins. Co. v. Coburn, supra,* 209 Cal.App.3d 914, faced with similar circumstances, came to opposite conclusions.

only 'use' of the boat was to transport Diepenbrock and Daly to the scene of the accident. Once there, the boat's engine was turned off and it became nothing more than a floating dock or platform. The alleged negligent act was not simply using this platform for diving, because the dive itself did not cause the injury; rather, it was Daly's alleged negligence in failing to survey the surrounding area and in permitting Diepenbrock to enter the water when [the other parent's] boat was, from all appearances, dangerously near. Such negligence on Daly's part was not in any way dependent on the use of the boat before liability would arise. His liability for his acts would be unaffected whether the acts occurred on a boat, a pier or on the shore. That they occurred on a boat is fortuitous. For example, if the facts of this case were unchanged, except that Daly and Diepenbrock had been standing on the shore of the lake when the ill-advised permission to swim was granted, the insurer could not contest that the resultant damage would be covered by the homeowner's policy. [Citation.] [The insurer] is attempting to avoid liability simply because the situs of Daly's allegedly negligent conduct was a boat." (148 Cal.App.3d at pp. 645–646.)

The plaintiff in *Julie R.* was raped by the uninsured driver of a car in which she had been riding as a passenger. She filed a claim against her uninsured motorist insurance provider, contending that her injures arose out of the "use" of the assailant's automobile. She argued that the assailant " 'used' certain physical aspects of the vehicle to trap her and to consummate the assault." (*Julie R., supra,* 76 Cal.App.4th at p. 139.) For example, he locked the doors and parked the car next to a fence so that the passenger side door could not be opened, thereby preventing her escape.

The majority concluded that the "uses" outlined by the plaintiff were insufficient to establish coverage. First, the court held that "the mere fact that a vehicle is the situs of the acts causing injury, or that a vehicle is used for transportation to the scene of a crime," was insufficient to establish coverage. (*Julie R., supra,* 76 Cal.App.4th at p. 140.) The court noted that in *Partridge,* the Supreme Court had cited favorably a case that required the use of the vehicle to be "a ' "predominating cause" or a "substantial factor" in causing the injury.' " (*Julie R.* at p. 140, quoting *Truck Ins. Exch. v. Webb* (1967) 256 Cal.App.2d 140, 148 [63 Cal.Rptr. 791].)

Applying a predominating cause/substantial factor test, the majority in *Julie R.* concluded that the "use of a vehicle as transportation to the scene of an injury does not establish a sufficient causal connection between the 'use' and the injury." (*Julie R., supra,* 76 Cal.App.4th at p. 140.) Conceding that

the placement of the car against the fence "increased the danger that [the assailant] would be successful in carrying out his intent to rape [plaintiff]," the court nonetheless concluded that "[t]he manner of operating the vehicle did not contribute directly to [plaintiff's] injury." (*Julie R.*, at p. 141.) The court found no essential difference between the precise placement of a vehicle to facilitate a crime and the mere use of the vehicle to transport the assailant and the victim to the location of the crime. (*Id.* at pp. 141–142.) Use of the vehicle as the location of the rape did not, in the majority's view, "rise to the level of a substantial factor in the injury." (*Id.* at p. 142.) "Although the door was locked and the passenger seat reclined, nothing about the operation of the vehicle contributed to the attack any more than furniture or a corner used to trap a rape victim in a house could be said to be substantial factor in causing a rape." (*Ibid.*) The majority concluded that any use of the car during the rape was "incidental to the attack, not a substantial causal factor." (*Ibid.*)

In a thoughtful dissent, Justice Epstein accepted that the operation of the vehicle "must be a substantial (as opposed to insubstantial) factor in bringing about the injury"; that there should be "no coverage if the role of the vehicle is merely that of 'furniture' "; and that "the mere circumstance that a vehicle is used to transport someone to the site where an injury occurs . . . is not enough for coverage." (*Julie R., supra,* 76 Cal.App.4th at pp. 147–148.) He saw no justification, however, for imposing "a predominance requirement," noting that "[i]n *Partridge,* the court said that the 'arising out of' formula 'has broad and comprehensive application, and affords coverage for injuries bearing almost any causal relation with the vehicle. . . .' [10 Cal.3d at p. 100.]" (*Julie R.,* at p. 147.) He emphasized that "the vehicle was not used as a passive piece of furniture, but as a cage to prevent the victim from escaping, thus enabling the motorist to commit the act of rape." (*Id.* at p. 147.) In addition, "[the assailant] locked the passenger window in a closed position and reclined the passenger seat, assuring the inability of the victim to get away." (*Id.* at p. 148.) He concluded "[t]hat [was] 'use' of the vehicle." (*Ibid.*)

Whether the test to be applied is predominating cause/substantial factor or minimal causal connection makes no difference here. The relationship between the use of the automobile and the injury was sufficient to trigger the exclusion. Dakota and Nehemaiha Prince-Smith died when they were left in an overheated vehicle. Unlike rape or assault, which can happen anywhere, the type of rapid onset hyperthermia suffered by the children is particularily likely to occur in a motor vehicle. The combination of a small confined glass and

metal space and a warm sunny day creates an environment in which heat is trapped and hazardous temperatures develop within a startlingly brief period of time. Thus, the vehicle, far from being merely the situs of the injury, was itself "the instrumentality" of it. (*National Indemnity Co. v. Farmers Home Mutual Ins. Co.*, *supra*, 95 Cal.App.3d at p. 109.) Moreover, the use of the vehicle was anything but "incidental" to the injuries suffered by its occupants. It was a predominating cause/substantial factor in their deaths.

Additionally, we perceive no separate and independent acts of negligence, unrelated to the use of the automobile. Unlike the negligence in modifying the gun trigger in *Partridge*, which occurred separate and apart from the defendant's operation of the vehicle, Smoot's conduct was integrally connected to the use of the vehicle. She did not merely leave the children unattended; she left them strapped into their car seats in a sweltering vehicle. The situation is more analogous to that in *Allstate Ins. Co. v. Jones* (1983) 139 Cal.App.3d 271 [188 Cal.Rptr. 557]. There, a man was killed when a rebar flew off the storage rack of the insured's pickup truck during a collision. The insurer raised the automobile exclusionary clause in a declaratory relief action. The parties stipulated that one act of negligence was "the failure . . . to properly 'load, secure, fasten, supervise and inspect the rebar.' " (*Id.* at p. 277.) The court concluded that this negligence was "auto-related," not a separate and independent cause of the injury. (*Ibid.*) The court contrasted the facts before it to another case in which the insured had "improperly stored his gun in his Travelall." (*Ibid.*) There, "the negligence . . . and the resulting accident did not depend upon his use of the automobile. Had he handled the gun improperly in any other place, a like accident might have occurred. In contrast, the improperly loaded rebar depended on the truck's movement and velocity to become a hazard." (*Ibid.*) Here, the injuries resulting from Smoot's negligence depended on her operation of the vehicle—specifically, her restraining, transporting and abandoning the children in the SUV.

In short, Smoot's negligence in leaving the children in the hot vehicle "simply cannot be dissociated from the use of the vehicle." (*National American Ins. Co. v. Coburn*, *supra*, 209 Cal.App.3d at pp. 920–921.) It was her abandonment of them in the vehicle that subjected them to the conditions causing their deaths. Had she left them on a park bench, in a grocery store, or on a neighbor's porch, they would not have expired from hyperthermia. We agree with the well-reasoned order of the trial court, and affirm the judgment.

## DISPOSITION

The judgment is affirmed.

Willhite, Acting P. J., and Suzukawa, J., concurred.