2019 IL App (4th) 190080

NO. 4-19-0080

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 21, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| COUNTRY MUTUAL INSURANCE COMPANY and COUNTRY PREFERRED INSURANCE COMPANY, | ) ) ) | Appeal from the Circuit Court of McLean County |
| Plaintiffs, | ) | No. 15MR304 |
| v. | ) | |
| OEHLER'S HOME CARE, INC.; SHELLIE OEHLER, Individually; and BETH YODER, as Executor of the Estate of Jeffrey Oehler, Deceased, | ) ) ) ) | Honorable Paul G. Lawrence, |
| Defendants-Appellees | ) | Judge Presiding. |
| (Country Mutual Insurance Company, Plaintiff-Appellant). | ) ) | |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        In February 2015, Shellie Oehler, as executor of the estate of Jeffrey Oehler (the Estate), filed a complaint against Oehler's Home Care, Inc. (OHC), alleging employees of OHC caused the death of Jeffrey Oehler, a spastic quadriplegic who required constant care, by negligently providing care while preparing to place Jeffrey in a van. The complaint alleged that in April 2013, two employees were preparing to place Jeffrey in a specialized vehicle to transport him home when Jeffrey fell from his wheelchair, broke his neck, and subsequently died. The complaint asserted that OHC's employees were negligent when they (1) "failed to properly monitor [Jeffrey] in his wheelchair during preparation for transport," (2) "failed to properly restrain [Jeffrey] in preparation for transport," and (3) "failed to properly and reasonably care for

[Jeffrey] to prevent a fall from his wheelchair."

¶ 2        In April 2015, plaintiff, Country Mutual Insurance Company (Country Mutual) filed a declaratory judgment action against OHC, Shellie Oehler, individually, and the Estate (collectively, defendants). (Beth Yoder was subsequently substituted as the executor of the Estate and as a party defendant in this case.) Country Mutual sought a declaration that it had no duty to defend the underlying action, asserting that Jeffrey's accident was excluded from coverage under OHC's business owners policy because the accident involved (1) the use of an auto and (2) the rendering of professional services.

¶ 3        In April 2018, the parties filed cross-motions for summary judgment. In January 2019, the trial court granted summary judgment in favor of defendants, concluding that the auto and professional services exclusions did not apply.

¶ 4        Country Mutual appeals, arguing the trial court erred when it entered summary judgment in favor of defendants and denied Country Mutual's motion for summary judgment because the accident involved (1) the use of a vehicle and (2) the rendering of professional services, both of which were excluded from coverage under the business owners policy. We agree with Country Mutual's first argument and reverse the trial court's judgment.

¶ 5                        I. BACKGROUND

¶ 6                        A. The Underlying Action

¶ 7        In February 2015, Shellie Oehler, as executor of the estate of Jeffrey Oehler, filed a complaint against OHC for the wrongful death of Jeffrey (hereinafter referred to as the underlying complaint). The underlying complaint alleged that Jeffrey "was confined to a wheelchair due to his medical condition and relied upon employees of [OHC] for his care." The underlying complaint stated employees of OHC transported Jeffrey to Sam's Club in April 2013

and "were in the process of preparing [Jeffrey] for transfer into his van seat when they failed to prevent a fall forward from his wheelchair." Jeffrey hit his head on the pavement and was taken to the hospital, where he was diagnosed with a fracture in his neck. Jeffrey died two days later.

¶ 8 The underlying complaint alleged OHC's employees were negligent in three separate ways because they (1) "failed to properly monitor [Jeffrey] in his wheelchair during preparation for transport," (2) "failed to properly restrain [Jeffrey] in preparation for transport," and (3) "failed to properly and reasonably care for [Jeffrey] to prevent a fall from his wheelchair." Count I asserted a claim for wrongful death while count II asserted a survival claim.

¶ 9 B. The Declaratory Judgment Complaint

¶ 10 In April 2015, Country Mutual filed a complaint for a declaratory judgment against OHC, Shellie Oehler, individually, and the Estate. (We note that Country Preferred Mutual Insurance Company (Country Preferred) was a "coplaintiff" to the complaint and sought a declaratory judgment that it had no duty to defend under a separate auto policy because defendants failed to provide proper notice. Eventually, Country Preferred moved for summary judgment, and the trial court granted judgment in its favor. However, the court's judgment as to Country Preferred is not at issue in this appeal.)

¶ 11 In its complaint, Country Mutual alleged that the business owners policy contained two applicable exclusions that relieved it of the duty to defend OHC against the underlying complaint. First, Country Mutual asserted that the auto exclusion excluded all claims relating to " 'Bodily injury' or property damage arising out of the ownership, maintenance, use or entrustment to others of any *** 'auto' *** owned or operated by *** any insured." Country Mutual claimed the accident arose out of the use of a vehicle and was therefore excluded from coverage.

¶ 12 Second, Country Mutual contended that the accident arose out of OHC's

employees' rendering "professional services," which were excluded from coverage. The policy stated professional services "includes but is not limited to *** [m]edical, surgical, dental, x-ray or nursing services treatment, advice or instruction; [and] *** [a]ny health or therapeutic service treatment, advice or instruction."

¶ 13                 C. The Motions for Summary Judgment

¶ 14                    1. *Other Procedural History*

¶ 15        The parties filed cross-motions for judgment on the pleadings, asserting that the policies either covered or did not cover the accident as a matter of law. The trial court denied these motions. The court then consolidated the declaratory judgment action with the action on the underlying complaint for the purposes of discovery only. Thereafter, Beth Yoder was substituted as the executor of the Estate, and consequently, the court substituted her as a party defendant.

¶ 16                       2. *The Estate's Motion*

¶ 17        In April 2018, the Estate filed a motion for summary judgment in which it argued that the business owners policy covered the accident. In support of its motion, the Estate attached (1) a copy of the underlying compliant, (2) a copy of the business owners policy, and (3) the depositions of Shellie, Shawna Lewis, and Charleston Balf.

¶ 18                        a. Shellie Oehler

¶ 19        Shellie testified that she married Jeffrey in 1983. In 1988, Jeffrey was injured in a work-related accident that rendered him a spastic quadriplegic. Shellie explained that Jeffrey was not completely paralyzed because he could move his arms and legs to some degree but with little control. Jeffrey could not function on his own and required assistance in every aspect of his life, including eating, bathing, getting dressed, maintaining hygiene, moving, walking, and getting from place to place. Jeffrey received this assistance from the home aides hired by OHC.

- 4 -

¶ 20        Shellie testified that, at home, Jeffrey was primarily in a specialized chair with small wheels on its legs, but he could walk with significant assistance. Shellie explained that two people, one on either side, would hold Jeffrey and he could swing his legs to walk while the home aides swayed him back and forth. Jeffrey was blind but could hear and communicate verbally. Shellie stated it was difficult for new people to understand him at first. Jeffrey was occasionally difficult and would flail and curse, particularly if he did not want to do something, like his stretches.

¶ 21        He would also get excited from time to time and could lean forward and fall out of his chair if not monitored. Staff would not attempt to transfer Jeffrey to or from his wheelchair or do other activities when he was active with his arms or legs for his safety.

¶ 22        Shellie testified she started OHC in 1992 as a home health care service to provide assistance solely to Jeffrey. Shellie was the president and lone shareholder of OHC. She used to work outside the home but became a full-time care provider for Jeffrey. She explained that as part of the settlement of claims surrounding Jeffrey's accident, his employer agreed to pay home health care costs for the rest of his life. She decided to start OHC because she believed she could provide better care for Jeffrey than he was receiving at that time. Shellie explained she did not have any formal training in how to care for a spastic quadriplegic person, but she learned how through a combination of observation and experience. Jeffrey was in rehabilitation and physical therapy programs for around a year after his accident, and Shellie learned from the providers of those services different things to do to assist and care for Jeffrey.

¶ 23        Shellie stated she was in charge of hiring employees of OHC. Jeffrey needed 24-hour care, and Shellie split the day into three shifts: (1) 8 a.m. to 4 p.m., (2) 4 p.m. to midnight, and (3) midnight to 8 a.m. Shellie had two employees on duty for the first two shifts and just one

employee on duty for the night shift because she was there for the entirety of the night shift. Shellie explained that she did not require prior experience or any specific training of prospective employees because she would train them on how to care for Jeffrey. However, Shellie agreed it was helpful if employees had prior nursing or home health care experience and some did.

¶ 24 Shellie testified that Shawna Lewis and Charleston Balf were working on the day of the accident. Lewis was a certified nurse assistant (CNA) who had worked at OHC for five years. Balf had no formal training but had worked for OHC for two and a half years. Shellie needed to go shopping at Sam's Club and wanted Jeffrey to come with her.

¶ 25 Shellie made every attempt to give Jeffrey a normal life. She stated that Jeffrey owned a specialized van to transport him. The van had a raised roof and lowered floor for greater accessibility. It also had a lift for a wheelchair in the back. Jeffrey rode in a captain's chair in the van because it was more comfortable and he did not like being in his wheelchair. Shellie said she needed assistance taking Jeffrey anywhere, so she drove separately to the store that day so she could put her purchases in her vehicle.

¶ 26 Shellie explained the process for transferring Jeffrey to the van as follows:

"They would position the wheelchair next to the van doors on the side, they would remove his leg rests and store them in the van, and then they would stand side by side at the wheelchair and stand him up and walk him a couple of steps to the van and turn around and then position themselves *** one underneath the top and one under the legs and lift him into the van."

Shellie stated she trained her employees to perform transfers in this manner and she would not allow them to transfer Jeffrey if they had not been trained. She also stated she was not taught to transfer him in this manner but came to the procedure through common sense and experience.

¶ 27        Shellie testified she did not see Jeffrey being loaded into the van on the day of the accident. Lewis and Balf had taken her purchases and put them in her car before they went to put Jeffrey in the van. Shellie stated someone came up to her vehicle and told her there was an accident. Shellie drove to the van and saw that Jeffrey had a skinned head and nose. Shellie asked what happened, and Lewis stated she had her back turned and did not see the fall. Balf said nothing. Someone called 911, and an ambulance took Shellie and Jeffrey to the hospital. Jeffrey died two days later.

¶ 28                                b. Shawna Lewis

¶ 29        Lewis testified she was a CNA and had worked for OHC for about five years prior to the accident. Lewis described Jeffrey's condition and her own responsibilities for his care consistently with Shellie's description at her deposition. Lewis stated that she never provided medical care to Jeffrey other than once putting a band aid on a blister on his foot. Lewis stated that her training helped her deal with Jeffrey and that lack of training would make it difficult for someone to assist a spastic quadriplegic person, particularly when transferring them to and from a wheelchair.

¶ 30        Lewis testified that she was working with Balf on the day of the accident. She said it had been a normal day and Jeffrey was in a good mood. They often took Jeffrey out of the house because Shellie wanted him to have a normal life. Lewis stated the wheelchair they used had a safety belt but they did not use it because "it would send him into a rage." Jeffrey did not like the belt and told them it was uncomfortable and would hurt him. When they were leaving the store, Lewis was pushing Jeffrey and Balf was alongside him, which was standard procedure. The van was in a handicap space about 100 feet from the door.

¶ 31        Lewis testified that the typical routine for transferring Jeffrey to the van was that

they would pull him up to the passenger's side of the van, open the doors, move the chair up to the door opening, and lock its wheels in place. Lewis explained that Jeffrey had two pillows with him in the wheelchair. Both of the pillows were placed on Jeffrey's right side. One of the pillows was placed under his right arm to prevent bruising because he clenched his arm to his side. The other pillow helped to stabilize him generally. Lewis stated that one person would take the pillows, go into the van, and situate the pillows to prepare for the transfer. The other person would stand on Jeffrey's right side to help, and "[Lewis] imagine[d]" it was that person's job to make sure he was stable and not falling. When they were ready, they would stand on either side of Jeffrey, lift him to his feet, walk him a few steps forward, and then turn his back to the van. One person would grab under his arms, and the other would lift his legs. They would then place him into the captain's chair, fasten his seatbelt, and place his arm pillow under his arm.

¶ 32      Lewis testified that on the day of the accident, she and Balf proceeded as described. Lewis remembered locking the chair in place and stepping into the van with the side pillow. She had her back to Jeffrey and could not see him or Balf. Lewis testified she heard Balf say, "Oh, my God, Jeff. What are you doing?" Lewis turned around and saw Jeffrey on the ground. Lewis stated she did not know what happened but speculated that Jeffrey got excited because of what they were planning on getting for lunch, which "was common," and she indicated they "[h]ad *** been talking about lunch at the time that he fell."

¶ 33      Lewis testified she and Balf stood Jeffrey up and Shellie arrived shortly thereafter. Lewis stated she asked Balf what had happened but Balf was crying very hard and did not provide an answer. Lewis told Shellie that she had been putting pillows in the van when Jeffrey fell. Lewis testified that typically the person assisting would stand next to Jeffrey and not in front of him. Lewis stated Jeffrey never fell out of his wheelchair during the five years she was employed at

OHC and could remember only one occasion when "it was close."

¶ 34                                         c. Charleston Balf

¶ 35          Balf testified she worked at OHC for two and a half years before Jeffrey's accident. She was not a CNA and did not have any home health care training prior to working at OHC. After she was hired, Balf worked two shifts during which she observed other employees providing care and received instructions from them about how things were done. Balf learned the remainder of what to do by talking with other employees and from her on-the-job experience.

¶ 36          Balf testified that her duties included giving Jeffrey a "bed bath" in the mornings, shaving him, giving him medication, preparing food, feeding him, walking, doing stretching exercises, and generally getting him whatever he needed. Balf stated that Jeffrey was not always cooperative, and employees had to continuously assess his activities to determine if it was safe to assist him. This was particularly true for transferring him into the van because he sometimes got excited and moved his arms and legs. Balf testified that when this happened, they waited for him to calm down before doing anything else.

¶ 37          Balf stated she was working on the day of the accident and remembered Lewis pushing the wheelchair as they left the store. Balf described the wheelchair as being able to tilt forward and backward and having special pillows and leg extensions, both of which were removable. Balf testified that they got to the van and Lewis got in the van to get the pillows situated. Balf then went to hand Jeffery's arm pillow to Lewis when Balf heard a noise. When Balf looked back, Jeffrey was on the ground with the top of his head on the pavement. Balf stated her back was to Jeffrey for "three seconds" at the time he fell. She could not remember if Lewis had grabbed the pillow Balf was handing her.

¶ 38          Balf testified that there was a seatbelt on the wheelchair, but she did not believe

they used it at all that day. She stated it was typically not used. She did not remember there being a formal procedure for transferring Jeffrey into the van, but usually one person would prep the van while the other person prepped Jeffrey, such as by taking the leg extensions off the chair. Balf could not remember if they had taken the leg extensions off on the day of the accident.

¶ 39　　　Balf testified that after Jeffrey fell, she and Lewis stood him up. Shellie arrived a minute later and began asking him questions to see if he remembered his name and the date. Someone called 911, and an ambulance arrived. Lewis drove Shellie's car to the hospital, and Balf followed in the van. Balf stated she told Shellie that Jeffrey "had fallen out of the chair when we were trying to get prepped to put him in the van." Balf had not talked to anyone else about what happened and stated she was very upset after the incident.

¶ 40　　　　　　　　　　d. The Estate's Arguments

¶ 41　　　The Estate argued that Country Mutual had a duty to defend under the business owners policy and that neither the auto nor the professional services exclusions applied. In particular, the Estate contended that the accident did not arise out of the "use" of an automobile because the van was not being operated at the time of Jeffrey's fall. The Estate asserted that merely because the injury occurred near a vehicle did not mean the injury was related to the vehicle.

¶ 42　　　The Estate also argued that the incident was not related to the loading or unloading of the van. The Estate acknowledged that the auto exclusion defined "use" as including loading and unloading but pointed out that the policy specifically defined loading and unloading as "the handling of property." The Estate asserted that because Jeffrey was not property, the exception did not apply. Thus, the Estate concluded that viewing the evidence in the light most favorable to Country Mutual, the underlying complaint asserted a cause of action that was potentially within the policy's coverage, and therefore Country Mutual had a duty to defend.

¶ 43        The Estate further argued the professional services exception did not apply because Lewis and Balf were not using "specialized knowledge" when they were preparing to place Jeffrey in the van. Instead, the only knowledge that was required was the knowledge of how to move a person from one place to another. Therefore, because Lewis and Balf both testified that they were not providing medical or nursing care at the time of the accident, the professional services exclusion did not apply.

¶ 44                    3. *Country Mutual's Cross-Motion*

¶ 45        Later in April 2018, Country Mutual filed a motion for summary judgment. (As we noted earlier, the trial court's entry of summary judgment in favor of Country Preferred regarding the auto policy is not at issue on appeal, and therefore, we do not address Country Preferred's motion for summary judgment against defendants.) Country Mutual relied on the same documents and depositions as the Estate and argued they showed that the accident was excluded from coverage under either the auto exclusion or the professional services exclusion.

¶ 46        Country Mutual contended the language in the underlying complaint unequivocally related to the use of a vehicle. Specifically, the Estate alleged in its complaint that Jeffrey was injured when OHC's employees were preparing to transfer him to the van. Further, Country Mutual asserted the depositions demonstrated that Lewis and Balf were engaged in loading pillows into the van as part of preparing to transfer Jeffrey into the van. Both Lewis and Balf admitted their backs were turned to Jeffrey and they did not see him fall. Accordingly, Country Mutual claimed the accident was caused by the loading and unloading of property or otherwise out of the inherent use of the van.

¶ 47        Regarding professional services, Country Mutual noted the underlying complaint alleged Jeffrey's injuries arose out of the care provided to him as the sole patient of OHC. The

- 11 -

depositions also revealed that caring for Jeffrey, a spastic quadriplegic, required specialized knowledge. Lewis was a CNA and opined that without her training, transferring Jeffrey would be much more difficult. Shellie trained her employees how to perform every major function with Jeffrey before allowing them to participate with assisting him directly, especially in the case of transferring him into the van. Even Balf, who was not a CNA, testified that she was required to continuously read Jeffrey's behaviors and actions to make sure it was safe to assist him. Based on these factors, Country Mutual argued the accident was caused by the rendering of professional services.

¶ 48                                  D. The Trial Court's Ruling

¶ 49          In January 2019, the trial court conducted a hearing on the parties' cross-motions for summary judgment and then entered a short written order concluding that the auto and professional services exclusions in the business owners policy did not apply. Accordingly, the court granted summary judgment in favor of defendants with respect to the business owners policy.

¶ 50          This appeal followed.

¶ 51                                  II. ANALYSIS

¶ 52          Country Mutual appeals, arguing the trial court erred when it entered summary judgment in favor of defendants and denied Country Mutual's motion for summary judgment because the accident involved (1) the use of a vehicle and (2) the rendering of professional services, both of which were excluded from coverage under the business owners policy. We agree with Country Mutual's first argument and reverse the trial court's judgment.

¶ 53                      A. The Applicable Law and the Standard of Review

¶ 54                                  1. *Summary Judgment*

¶ 55          Summary judgment is appropriate when "the pleadings, depositions, and

- 12 -

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28, 978 N.E.2d 1000. "The mere filing of cross-motions for summary judgment, however, does not obligate the circuit court to grant one of the motions [citation], and if reasonable people could draw different inferences from the undisputed facts, summary judgment is inappropriate." *Travelers Property Casualty Co. of America v. ArcelorMittal USA Inc.*, 2019 IL App (1st) 180129, ¶ 11, 126 N.E.3d 441. When examining whether a genuine issue of material fact exists, a court construes the evidence in the light most favorable to the nonmoving party and strictly against the moving party. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22.

¶ 56                                    2. *The Duty to Defend*

¶ 57          "In a declaratory judgment action in which the issue is whether the insurer has a duty to defend, courts first look to the allegations in the underlying complaint and compare those allegations to the relevant provisions of the insurance contract." *Illinois State Bar Ass'n Mutual Insurance Co. v. Leighton Legal Group, LLC*, 2018 IL App (4th) 170548, ¶ 35, 103 N.E.3d 1087. "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455, 930 N.E.2d 1011, 1017 (2010). The allegations in the underlying complaint are construed liberally and are not required to be in any particular form. *Empire Indemnity Insurance Co. v. Chicago Province of the Society of Jesus*, 2013 IL App (1st) 112346, ¶ 35, 990 N.E.2d 845. "The question of coverage should not hinge on the draftsmanship skills or whims of the plaintiff in the underlying

action." *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 312 Ill. App. 3d 998, 1007, 728 N.E.2d 680, 688 (2000). Moreover, if the underlying complaint alleges multiple theories of recovery against the insured, the duty to defend arises even if only one such theory is potentially within the coverage of the policy. *Empire Indemnity Insurance Co.*, 2013 IL App (1st) 112346, ¶ 34.

¶ 58                                  3. *Construction of the Policy*

¶ 59            "The primary objective when construing the language of an insurance policy is to ascertain and enforce the intentions of the parties as expressed in their agreement." *Illinois State Bar Ass'n Mutual Insurance Co.*, 2018 IL App (4th) 170548, ¶ 40. If the terms of the policy are clear and unambiguous, they are given their plain and ordinary meaning. *Id.*; *Pekin Insurance Co.*, 237 Ill. 2d at 455-56. Any ambiguities or provisions that limit or exclude coverage are construed strictly against the insurer who drafted the policy and liberally in favor of the insured. *Illinois State Bar Ass'n Mutual Insurance Co.*, 2018 IL App (4th) 170548, ¶ 40. "A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." (Internal quotation marks omitted.) *Pekin Insurance Co.*, 237 Ill. 2d at 456.

¶ 60            "If an insurer relies on an exclusionary clause to deny coverage, it must be clear and free from doubt that the exclusionary clause applies." *Illinois State Bar Ass'n Mutual Insurance Co.*, 2018 IL App (4th) 170548, ¶ 37. "This is so because there is little or no bargaining involved in the insurance contracting process [citation], the insurer has control in the drafting process, and the policy's overall purpose is to provide coverage to the insured." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 119, 607 N.E.2d 1204, 1217 (1992).

¶ 61                                  4. *The Standard of Review*

¶ 62    A trial court's entry of summary judgment is reviewed *de novo*. *Beaman*, 2019 IL 122654, ¶ 22. Similarly, an appellate court reviews *de novo* a trial court's construction of an insurance policy. *Illinois State Bar Ass'n Mutual Insurance Co.*, 2018 IL App (4th) 170548, ¶ 40.

¶ 63                                    B. This Case

¶ 64                            1. *The Parties' Arguments*

¶ 65    Country Mutual first argues the trial court should have granted summary judgment in its favor because the auto exclusion applies, which excludes coverage for bodily harm that arises out of the use of a vehicle, including "loading or unloading." Country Mutual contends that the underlying complaint explicitly alleged negligence based on actions taken "during preparation for transport." In support of its position, Country Mutual relies on cases explaining that "use" of an auto is broader than simply operation and "encompasses its employment for any purpose that is rationally connected to the vehicle for the purpose of providing transportation or satisfying some other related need of the user." See *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 401-02, 930 N.E.2d 943, 949 (2010). Country Mutual asserts that Lewis and Balf's actions cannot be separated from the use of the vehicle because they were in the process of preparing to transfer Jeffrey to the van and those actions caused his injury. Accordingly, Country Mutual asserts the auto exclusion applies and it has no duty to defend.

¶ 66    Defendants respond that Country Mutual is fundamentally incorrect in two ways. First, the negligence at issue in this case is wholly unrelated to the use of the van. Instead, defendants contend the act of negligence was the failure to secure Jeffrey in the wheelchair with a safety belt. Defendants claim that Jeffrey could have fallen out of his chair at any time and the fact that he did so near the van in preparation for transfer is a mere coincidence and insufficient to fall under the auto exclusion.

¶ 67 Second, defendants argue the cases relied upon by Country Mutual deal with *coverage* under an auto policy and not an auto *exclusion* provision under a business owners policy. Defendants assert the provisions of the policies are to be construed differently, with the former being construed broadly and the latter construed narrowly. Further, defendants note that the underlying complaint asserts OHC "failed to properly and reasonably care for [Jeffrey] to prevent a fall from his wheelchair" and this conduct is unrelated to the van. Defendants claim the trial court properly construed the auto exclusion narrowly and recognized that the underlying complaint alleged conduct which potentially fell within coverage.

¶ 68 In reply, Country Mutual maintains that cases dealing with coverage under an auto policy are relevant to interpreting the breadth of an auto exclusion provision because the two work together. That is, the business owners policy is designed to cover risks inherent in operating a business and to exclude occurrences that are covered by a separate auto policy. Country Mutual further asserts that the term "use of an auto" has an established legal meaning and should be applied uniformly without regard to the type of policy at issue.

¶ 69                                  2. *"Use" of an Auto*

¶ 70 Ultimately, we conclude that the negligence alleged in the underlying complaint falls under the auto exclusion and, therefore, Country Mutual has no duty to defend. Although Illinois courts have stated, "the term 'use' is neither elusive in its meaning nor subject to multiple constructions" (*Constitutional Casualty Co. v. Soder*, 281 Ill. App. 3d 657, 661, 667 N.E.2d 574, 577 (1996)), no case has set forth a specific definition or test for what constitutes "use" of a vehicle. The Illinois Supreme Court has stated, "the use of an automobile has been held to denote its employment for some purpose of the user." *Schultz*, 237 Ill. 2d at 401. In *Schultz*, the supreme court indicated that " 'use' is not limited to operating or driving a motor vehicle. It also includes

- 16 -

riding in one as a passenger." *Id.* at 402.

¶ 71    Defendants argue that only cases interpreting the term "use" in the context of an auto exclusion provision are relevant to this case. However, we agree with Country Mutual that there is no basis in Illinois law to limit review in such a manner. Indeed, the very case defendants rely on, *Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care*, 343 Ill. App. 3d 309, 795 N.E.2d 1034 (2003), demonstrates that courts review all cases that have addressed the "use" of an automobile when determining whether a duty to defend exists regardless of whether the case dealt with the issue of coverage or exclusion.

¶ 72    To determine whether the accident in this case arose out of the use of an auto, we find *Mount Vernon* to be instructive but distinguishable. In *Mount Vernon*, an infant died from heat stroke after he was left unattended in a van operated by a day care. *Id.* at 311. The child's estate sued the day care, alleging the day care failed to assign sufficient personnel to help transport children, failed to remove him from the van, failed to have a procedure to ensure that children were removed from the van, failed to perform a head count, and failed to maintain a safe environment. *Id.* at 311-12. The day care's insurer filed a declaratory judgment action, asserting that the policy excluded coverage for both professional liability and liability arising out of the use of an auto. *Id.* at 312. The auto insurer intervened and sought a declaration that the general liability insurer was required to share defense costs. *Id.* The trial court entered a judgment on the pleadings in favor of the auto insurer, finding that the child's death was not the result of the operation or use of the van but because the child was negligently left in the van by the driver. *Id.* at 312-13.

¶ 73    On appeal, the First District examined Illinois cases that had addressed the issue of when an injury arises out of the use of an auto. *Id.* at 315-19. Based on those cases, the court concluded as follows:

"[T]he death of an infant from heatstroke when left unattended in a vehicle for an eight-hour period is attenuated from the actual legitimate purpose of the van. Although the transport of children to [the day care] is certainly a legitimate purpose *** , the deserting of a small child in the vehicle for an extended period of time is not." *Id.* at 319.

Accordingly, the court believed the injury "occurred when the van was not being used at all." *Id.* The court further concluded that, based on the allegations in the underlying complaint, the death was caused by "nonvehicular conduct on the part of [the day care] and its employees," such as the failure to maintain an accurate head count. *Id.* at 319-20. "In short, the van [was] the situs, rather than the cause, of [the] death." *Id.* at 320. Finally, the First District stated that the death did not arise out of the use of a vehicle because "leaving an infant in an automobile used to transport him to a day-care facility is not a normal or reasonable consequence of the use of the vehicle." *Id.*

¶ 74 We note that later courts to consider the issue have disagreed with *Mount Vernon*'s conclusion that the van was the mere situs of the injury. See *Lincoln General Insurance Co. v. Aisha's Learning Center*, 468 F.3d 857, 861 (5th Cir. 2006) (declining to follow *Mount Vernon* on nearly identical facts because the failure to remove a child from a car arose out of the use of an automobile); *Prince v. United National Insurance Co.*, 47 Cal. Rptr. 3d 727, 735 (Ct. App. 2006) (concluding under similar facts that rapid onset hyperthermia "is particularly likely to occur in a motor vehicle" and "far from being merely the situs of the injury, [the vehicle] was itself 'the instrumentality' of it"). Regardless of any potential merit of these criticisms, *Mount Vernon* is distinguishable from this case because of its unique facts. Like the First District in *Mount Vernon*, we conclude that cases dealing with whether a claim arose out of the use of a vehicle are relevant to determining if the auto exclusion applies and examine those cases for guidance.

¶ 75                    a. Causal Connection Versus Mere Situs of Injury

¶ 76          The First District in *Mount Vernon* looked at two cases in particular to determine whether there was a causal connection between the accident and the vehicle such that the accident arose out of the use of the vehicle. In *State Farm Mutual Automobile Insurance Co. v. Pfiel*, 304 Ill. App. 3d 831, 710 N.E.2d 100 (1999), the mother of a murder victim who was stabbed in an automobile, sued the parents of the murderer (and the murderer), and the issue was whether the "use" of the automobile by the murderer qualified as "use" of an automobile within the scope of coverage under the parents' auto policy. The murderer had borrowed his parents' car and had driven the victim to a forest preserve where he stabbed her to death and hid her body, which the mother contended could have happened only because the car confined the victim and helped avoid detection. *Id.* at 832-33.

¶ 77          The appellate court held that the way the murderer "used" the car to kill the victim was "attenuated from the actual legitimate purpose of an automobile and, therefore, not contemplated by the parties to the insurance contract." *Id.* at 836-37. The court held that a "causal relation or nexus must exist *** between the accident or injury and the ownership, use or maintenance of the vehicle in order for the accident or injury to come within the policy coverage," and that the causal connection "must be more than incidental or fortuitous; the injury must be reasonably identifiable with the normal ownership, maintenance or use of the vehicle." *Id.*

¶ 78          In *Aryainejad v. Economy Fire & Casualty Co.*, 278 Ill. App. 3d 1049, 1051, 663 N.E.2d 1107, 1110 (1996), the court examined tests applied by courts around the country to determine whether an injury arises out of the ownership, use, or maintenance of a vehicle. The majority of courts apply a "but for" causation test. *Id.* at 1052. The Third District in *Aryainejad*, however, adopted the approach of courts that "afford coverage where the injury is the result of an

activity that presented the type of risk that the parties reasonably contemplated would be covered by the policy." *Id.* at 1053. Those courts "resolved this issue by determining whether the alleged 'use' is reasonably consistent with the inherent nature of the vehicle." *Id.* "Use that is consistent with a vehicle's inherent nature extends beyond the actual operation of the vehicle to include activities that are reasonable and foreseeable consequences of the use of the vehicle." *Id.*

> "The inquiry should be whether the negligent act which caused the injury, although not foreseen or expected, was in the contemplation of the parties to the insurance contract a natural and reasonable incident or consequence of the use of the automobile, and thus a risk against which they might reasonably expect those insured under the policy would be protected." (Internal quotation marks omitted.) *Id.*

¶ 79    In this case, defendants assert that the van is at most the mere situs of the injury and the negligence was the failure to secure Jeffrey in the wheelchair at any point on the shopping trip, but we disagree. We conclude the van was not the mere situs of the injury. First, the allegations in the underlying complaint make clear that the use of the van to transport Jeffrey was an integral part of the accident. Although the underlying complaint contains one allegation that states generally that OHC failed to prevent a fall from his wheelchair, the complaint as a whole is clearly directed towards the actions taken in direct relation to transferring Jeffrey to the van. The underlying complaint alleges that OHC's employees "failed to properly monitor [Jeffery] in his wheelchair during preparation for transport" and "failed to properly restrain" him "in preparation for transport." The complaint also alleges that OHC's employees "were in the process of preparing [Jeffrey] for transfer into his van seat when they failed to prevent a fall forward from his wheelchair." Unlike *Mount Vernon*, the underlying complaint, construed as a whole, is directed

- 20 -

toward conduct related to the vehicle as opposed to nonvehicular conduct.

¶ 80    Further, the depositions make clear that the accident would not have occurred but for the preparations for putting Jeffrey in the van. Lewis testified that in the five years she worked for OHC she could think of only one "close call" where Jeffrey nearly fell from his wheelchair. Lewis, Balf, and Shellie all testified that two people were present to assist Jeffrey in any significant daily activity he took, especially transporting him to the van. All three further testified that two people were present in part to watch and monitor the situation. When transferring Jeffrey into the van, one employee needed to get into the van to arrange the pillows, while the second person was to stand next to Jeffrey and keep an eye on him. Balf testified that she was standing in front of Jeffrey and had her back to him when the accident occurred because she was handing a pillow to Lewis. Given this context, Jeffrey's accident was not "attenuated" or "incidental" to the use of the car.

¶ 81    In theory, Jeffrey could have fallen out of his wheelchair at any point if he was left unsupervised because he was not restrained with a safety belt. However, the facts of this case demonstrate that Jeffrey was left unsupervised *because Lewis and Balf were preparing to transfer Jeffrey into the van*.

¶ 82    We note that the circumstances in this case—that is, preparing to place Jeffrey in the van—are very similar to those in preparing to place a toddler or young child in a car. A parent or other person caring for the child may have to insert a car seat, or adjust a car seat, or move items in the car to make room, or take some other action to prepare the car so that a child may be seated properly. Any person engaged in these actions is certainly *using* the car. See *Constitutional Casualty Co.*, 281 Ill. App. 3d at 661 (holding that temporarily leaving a child in a car to drop off another child was an inherent use of the car and alternatively qualified as loading and unloading

under the auto policy).

¶ 83    The purpose of the car is to transport people, and a young child may be placed in a car only if there is an appropriate car seat in place. If during this process the child were to run off into a lane of traffic, it would be nonsensical to suggest that the parent was not using the car and the accident was therefore not covered by the auto policy. See *National Indemnity Co. v. Farmers Home Mutual Insurance Co.*, 157 Cal. Rptr. 98, 100-01 (Ct. App. 1979) (holding accident to child who ran into traffic after parent parked car at home was excluded under homeowner's policy but covered as "use" of the vehicle under auto policy). Any parent of a toddler knows that the toddler may behave suddenly and without an appreciation of potential danger. See *id.* ("The conduct of an ambulatory child of tender years is often impulsive and unpredictable. [Citation.] The process of unloading a child from a motor vehicle does not end the moment that the child's feet touch the ground or when his or her body is entirely outside the vehicle."). In that sense, any time a toddler is not being watched, an accident may occur. But the simple fact that a *similar* accident has the possibility of occurring at some other location does not change the fact that an accident that in fact occurs while a parent is preparing to place a child in a car qualifies as using the car.

¶ 84    Further, as in *Aryainejad*, placing a disabled person in a van is clearly a normal and reasonable consequence of the use of the vehicle. One of the fundamental actions associated with the use of an automobile is entering and exiting the vehicle. Indeed, it is hard to imagine an action more fundamental to the use and enjoyment of a vehicle than entering it whether the person entering is a driver or passenger. See *Marzell v. Charlyn Enterprises, LLC*, 51,209, p. 8 (La. App. 2 Cir. 2/15/17); 215 So. 3d 405 ("getting in and out of a car is an inevitable and integral part of operating it"). The depositions revealed that Jeffrey owned the van and liked going on trips away from the house. Jeffrey could not possibly use his van unless he could get in it, and—as with all

things for Jeffrey—he needed assistance and preparation in order to enter, enjoy, and use his van as a means for transportation.

¶ 85        In this case, Lewis and Balf had rolled Jeffrey up to the van, opened the doors, moved the wheelchair up to the opening, and locked the wheels in place. Lewis then entered the van to arrange Jeffrey's pillows so that he could sit comfortably and safely inside. Balf was there to assist and watch Jeffrey to make sure nothing happened. Jeffrey, because of his condition, was waiting for the process to be completed so he could enter the van. Given the facts of his situation, Jeffrey was using the van in the same way anyone else does when they attempt to enter a vehicle. See, *e.g.*, *Goodwin v. Lumbermens Mutual Casualty Co.*, 85 A.2d 759, 764 (Md. 1952) (passengers who were hit by another car were covered by auto policy because they had reached their own vehicle, opened the door, and were entering or waiting to enter it when the accident occurred); *State Farm Mutual Automobile Insurance Co. v. Vaughn*, 558 S.E.2d 769, 771 (Ga. Ct. App. 2002) (finding a child that was hit by a vehicle while crossing the road to gain entry to a school bus was "using" the bus); *Newman v. Erie Insurance Exchange*, 507 S.E.2d 348, 352 (Va. 1998) (same); see generally *Texas Farm Bureau Mutual Insurance Co. v. Sturrock*, 146 S.W.3d 123, 131-34 nn.10-12 (Tex. 2004) (collecting cases on when a person is considered "entering" a vehicle). Accordingly, Jeffrey was clearly "using" the van at the time of the accident.

¶ 86        For a spastic quadriplegic such as Jeffrey, the process of transferring him to the van likely presented an increased risk. Jeffrey could walk only with significant assistance and needed to be lifted into the van and placed in a seat arranged with pillows for his comfort and safety. Shellie, Lewis, and Balf all testified that Jeffrey had to be monitored because he was easily excitable and could not be handled when he flailed his arms or legs, which occurred regularly. Shellie testified that she did everything she could to give Jeffrey a normal life, including taking

- 23 -

him with her while she shopped. Lewis testified Jeffrey enjoyed going on trips and getting out of the house. Given this context, the parties to the business owners policies would have expected that getting Jeffrey in and out of a vehicle was a longer and more risky process than for able-bodied persons. They also would have reasonably expected this process to occur with some frequency given how much Shellie and Jeffrey liked to use the van. As such, any negligence that occurred during this process would reasonably fall under an auto policy.

¶ 87                                    b. Wholly Independent of the Use

¶ 88            Finally, unlike *Mount Vernon*, the facts alleged in the underlying complaint and the depositions on file demonstrate that the negligence in this case cannot be separated from OHC's employees' use of the van. Some cases have held that when "the underlying complaint describe[s] acts of alleged negligence and theories of recovery wholly independent from those relating to the allegedly negligent operation of the automobile," the auto exclusion does not operate as a bar to coverage. *Allstate Insurance Co. v. Pruitt*, 177 Ill. App. 3d 407, 411, 532 N.E.2d 401, 403-04 (1988); see also *Northbrook Property & Casualty Co. v. Transportation Joint Agreement*, 194 Ill. 2d 96, 99, 741 N.E.2d 253, 254 (2000). In *Northbrook*, for example, the supreme court concluded that the plaintiffs' claims were excluded under the relevant auto exclusion provision because their allegations were "nothing more than rephrasings of the fact that the students' injuries arose from the school districts' use or operation of a motor vehicle." *Northbrook*, 194 Ill. 2d at 99.

¶ 89            Defendants argue that this case is distinguishable from *Northbrook* because that case involved an accident that occurred when a bus full of students struck a train, whereas the instant case does not involve the operation of the van. However, as we earlier described, Jeffrey and OHC's employees were using the van when they were preparing it so they could transfer Jeffrey to the captain's chair. Here, the Estate cannot state a claim that does not involve the use of

the van. Jeffrey's injuries necessarily flow from his use of the van. Part of the use of the van was entering it. The witnesses testified Jeffrey regularly went on trips, enjoyed getting out of the house, and had as close to a normal life as he could under the circumstances. Jeffrey could not do any of these things without being loaded in his van, and he would not have been injured had Lewis and Balf not been in the process of preparing to transfer him to the van. Accordingly, the underlying complaint does not set forth any claims "wholly independent" of the injuries arising out of the use of the van.

¶ 90        In *Marzell*, the plaintiff was a resident of a nursing home who was obese, diabetic, on dialysis, and confined to a wheelchair. *Marzell*, 51,209, at 1. Staff at the nursing home wheeled the plaintiff onto the lift of a specialized van in order to transport her to a dialysis center. *Id.* The staff member started the process of raising the plaintiff and then walked into the van to pull the wheelchair in, but at some point, the plaintiff turned to wave to someone and her shifting weight caused the wheelchair to fall off the lift. *Id.* at 1, 7. The plaintiff sued and alleged the nursing home was negligent by failing to (1) properly secure the wheelchair or (2) use an appropriate wheelchair to load the plaintiff into the van. *Id.* at 1-2. The insurer moved for summary judgment, arguing the claims were barred by an auto exclusion. *Id.* at 2. The plaintiff argued the nursing home was negligent in ways other than the use of the van, including (1) using an improperly sized wheelchair, (2) failing to follow policy and procedure in moving a patient, (3) failing to secure the wheelchair, (4) leaving her unattended, and (5) failing to have two employees assist. *Id.* at 3. The trial court granted summary judgment in favor of the insurer. *Id.* at 4.

¶ 91        On appeal, the plaintiff made arguments very similar to those defendants raise in this case, including (1) the auto exclusion should be construed narrowly against the insurer, (2) the underlying complaint alleged nonvehicular conduct was the cause of the fall (selecting the wrong

wheelchair and failure to monitor), and (3) "the accident could have happened a mile away from the van." *Id.* at 6-7. The appellate court disagreed, explaining that based on the facts of the case "the only possible conclusion is that the accident flowed from getting [the plaintiff] into the lift van, a normal use of the automobile." *Id.* at 7. Although the plaintiff alleged other conduct that suggested the accident could have occurred anywhere, "they introduced no summary judgment evidence to show that the wheelchair was defective or inappropriate \*\*\*, or that anything other than the use of the lift van caused [the] fall." *Id.* Finally, the court concluded that although insurance policies are construed broadly in favor of coverage, the conduct in the case "fits the automobile use exclusion" and no compelling reason existed not to apply the provision. *Id.* at 8-9.

¶ 92        We acknowledge that *Marzell* is not binding on this court but find its reasoning helpful and persuasive, particularly because we have found few cases from any jurisdiction that involve disabled persons using automobiles and have not found any from Illinois. The facts of *Marzell* are clearly quite similar to the case before us. Jeffrey was a disabled person who required assistance to enter his van. Although defendants attempt to characterize the negligence that occurred in this case in a number of different ways, the allegations and testimony in the depositions demonstrate that the accident cannot be separated from the use of a vehicle. Accordingly, we conclude the auto exclusion applies and the trial court erred by entering summary judgment in favor of defendants.

¶ 93                    3. *The Construction of Exclusion Provisions*

¶ 94        Defendants rest a large portion of their argument on principles of construction of insurance policies. Specifically, the principle that limitations or exclusions are to be construed narrowly against the insured and in favor of coverage. Although this is the general principle, "the court should neither distort the meaning of the words so as to reach a desired result nor invent

ambiguities where none exist." *Oakley Transport, Inc. v. Zurich Insurance Co.*, 271 Ill. App. 3d 716, 725, 648 N.E.2d 1099, 1106 (1995). "A court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." (Internal quotation marks omitted.) *Pekin Insurance Co.*, 237 Ill. 2d at 456.

¶ 95     The First District has succinctly explained the purpose of auto exclusions as follows:

> "The purpose of [an auto] exclusion is related to the purpose of business liability insurance in general. Standard commercial liability policies are issued to cover all hazards incident to the operation of a business with the exception of certain excluded risks, including those involved in the ownership maintenance, use or entrustment of an 'auto'. The premium charged by the [commercial general liability] insurer reflects the underwriting objective of placing automobile accidents beyond the scope of coverage. These latter risks involve unique hazards to which the general business of the insured is not subject. For that reason, they are generally covered as a special class by an automobile liability policy ***." *Oakley Transport, Inc.*, 271 Ill. App. 3d at 726.

¶ 96     We fully agree with the First District's assessment and add that these principles should be kept in mind when construing exclusion provisions. Auto exclusions are not unreasonable; indeed, they are often good business practice. Courts ought to respect them when the evidence presented demonstrates they apply and ought not strain to avoid their application. Courts should not seek ways around their clear applicability when the circumstances demonstrate that they apply.

¶ 97        Exclusions should not be looked upon with disfavor as a matter of public policy. As explained in *Oakley*, automobile insurance is categorically different from other types of insurance. The risks are higher, the costs of coverage are more expensive, and it is so important to society that most, if not all, states require motorists to have it. Given this context, insurers and insureds alike benefit when insurance terms are given uniform meaning and exclusions are honored. That way, both parties avoid paying for double coverage when it is not desired and are able to pay a lower cost to insure precisely what they mean to. If insurers are not allowed to exclude certain types of activities, the price of general liability insurance increases and may become unaffordable to some, which would be detrimental as a matter of public policy. In short, when the provisions of a policy exclusion are unambiguous and clearly applicable—as here—courts should not hesitate to apply them.

¶ 98                          C. Alternative Arguments of the Parties

¶ 99        We note that the parties also debate the impact in this case of the definition of the term "loading and unloading." Defendants note that "loading and unloading" means the "handling of property," and Jeffrey is not property. Country Mutual contends that the pillows used to support Jeffrey were property and claims they caused the accident. Although we agree that Jeffrey is not property within the meaning of the business owners policy, we do not address whether the loading and unloading of pillows caused the accident because we conclude that the accident arose out of the use—preparing to place a disabled person in a vehicle—of a vehicle.

¶ 100       Because we conclude that the auto exclusion applies, we need not address whether the professional services exclusion also applies.

¶ 101                                III. CONCLUSION

¶ 102       For the reasons stated, we reverse the trial court's order granting defendant's

motion for summary judgment and remand with directions for further proceedings consistent with this opinion.

¶ 103        Reversed and remanded with directions.

**No. 4-19-0080**

| | |
|---|---|
| **Cite as:** | *Country Mutual Insurance Co. v. Oehler's Home Care, Inc.*, 2019 IL App (4th) 190080 |
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 15-MR-304; the Hon. Paul G. Lawrence, Judge, presiding. |
| **Attorneys for Appellant:** | Barbara Snow Mirdo, of Thielen, Foley & Mirdo, LLC, of Bloomington, for appellant. |
| **Attorneys for Appellee:** | Laura A. Castagna, of Kelly & Castagna, LLC, of Bloomington, and Joseph W. Dunn, of Pekin, for appellees. |